### FRANCE PACKING CO. v. DAILEY et al.
### Civil Action No. 5423.

District Court, E. D. Pennsylvania.
Sept. 23, 1946.

C. Tracy Taylor, of Philadelphia, Pa., for plaintiff.

Louis H. Wilderman, of Philadelphia, Pa., for defendants.

KALODNER, Circuit Judge.

This action to recover damages was brought by the plaintiff pursuant to Section 8(c) of the War Labor Disputes Act, 1943, 57 Stat. 167, 50 U.S.C.A.Appendix, § 1508(c). The defendants filed a motion to dismiss asserting that the complaint fails to state a cause of action upon which relief may be granted.

The controversy herein may be simply stated. Section 8(c) of the Act, provides in part, that "Any person who is under a duty to perform any act required under subsection (a) and who willfully fails or refuses to perform such act shall be liable for damages resulting from such failure or refusal to any person injured thereby and to the United States if so injured." The precise issue involved in the instant case, then, is whether subsection (a) of Section 8 imposes any duty upon the defendants which they have willfully failed or refused to perform.

Section 8(a) of the Act, insofar as it is involved here, is set out in the margin.[1] Specifically, the complaint alleges that the defendants on October 31, 1945, "wilfully refused to continue production", and incited other employees in the same bargaining unit to refuse to continue production.

Paragraph five of the Complaint admits that District Lodge No. 1 of the International Association of Machinists, the representative of plaintiff's employees,[2] did file, on October 24, 1945, the notice of a labor dispute required by Section 8(a) (1) of the Act. Plaintiff's action, accordingly, is premised on an interpretation of Section 8(a) (2) which would impose upon the defendants, as employees, a duty to have continued production for at least thirty days following the notice of a labor dispute given by the Union, and it is this alleged obligation which the plaintiff asserts that the defendants have wilfully failed and refused to perform.

The War Labor Disputes Act, more familiarly known as the Smith-Connally Act, has not previously been judicially construed insofar as it is here pertinent. The legislative history and the discussions of the legislators on the measure, however, offer aid in the proper construction and application of the Section 8(a) (2) of the Act.[3]

---

[1] "(a) In order that the President may be apprised of labor disputes which threaten seriously to interrupt war production, and in order that employees may have an opportunity to express themselves, free from restraint or coercion, as to whether they will permit such interruptions in wartime—

"(1) The representative of the employees of a war contractor, shall give to the Secretary of Labor, the National War Labor Board, and the National Labor Relations Board, notice of any such labor dispute involving such contractor and employees, together with a statement of the issues giving rise thereto.

"(2) For not less than thirty days after any notice under paragraph (1) is given, the contractor and his employees shall continue production under all the conditions which prevailed when such dispute arose, except as they may be modified by mutual agreement or by decision of the National War Labor Board."

[2] The plaintiff's complaint alleges that the defendant Dailey is a shop steward and the defendants Brown and Kober are committeemen.

[3] The War Labor Disputes Act began as S. 796, 78th Congress, 1st Session (1943). References to the bill occur in 89 Cong. Record, as follows: 1377; reported back (S. Rep. 147), 2730; debated, 3767, 3768, 3806, 3881, 3895, 3897, 3969, 3970; amended and passed Senate, 3993; referred to House, 4076; reported with amendment (H. Rep. 440), 4245; debated, 5220, 5221, 5222 (H. Res. 234) 5235, 5236, 5248, 5249, 5298, 5347, 5382, 5387–5392; amended and passed House 5392; ordered printed, Senate disagrees, 5382; conferees appointed, 5382, 5444; printed in record with House amendment, 5382; House insists, 5444; conference report submitted

Plaintilff's contention places exceptional emphasis upon the words "shall continue production" contained in Section 8(a) (2), and derives therefrom a mandatory duty upon every employee to continue to work during the thirty days succeeding the notice of a labor dispute.

Section 8(a) (2), however, does not stop with the quoted words. The sense of the provision is amplified by the words following, and the section must be read and construed in its entirety: "the contractor and his employees *shall continue production under all the conditions which prevailed when such dispute arose,* except as they may be modified by mutual agreement or by decision of the National War Labor Board." (emphasis supplied).

Read as a whole, it is evident that the purpose of this section is essentially to preserve the status quo of working conditions during the thirty day "cooling-off" ` period. Impliedly, the subsection carries out the conceptual basis of Section 8, that no official strike should be called within the thirty days. Nevertheless, in my opinion, the subsection under consideration does not deprive the individual worker of the right, or privilege, to leave his job on his own initiative.

Plaintiff appears willing to concede, lest it clash with the Constitutional prohibition against involuntary servitude, that subsection (2) of Section 8(a) does not operate to prevent an employee from quitting his job. It asserts that, on the contrary, the subsection does operate to prevent the employee from striking. The difficulty with this theory is that, even underscoring the words "shall continue production", as plaintiff does, the subsection would afford no basis of distinction upon the reasons impelling the individual worker to leave his post, except perhaps if the employee's act is part of a concerted strike: but even then the distinction is of doubtful validity, for the theory of Section 8, as its title and preamble indicate, is to destroy the desire, or willingness, of union leaders to call a strike, and to repose that will in the employees themselves.

To construe Section 8(a) (2) as requiring an employee to continue working for the plaintiff despite his will to the contrary would make Section 8, which deals with privately operated plants, more stringent than in the case where the government has taken over under Section 3 of the Act, 50 U.S.C.A.Appendix, § 1503. Thus, Section 6, 50 U.S.C.A.Appendix, § 1506, while it prohibits, upon criminal penalties, any person from doing certain things,[4] does not prevent an employee from leaving his job for any reason. On the contrary, it expressly provides that "No individual shall be deemed to have violated the provisions of this section by reason only of his having ceased work or having refused to continue to work or to accept employment." The mere absence of similar language in the framework of Section 8 cannot be regarded as requiring a different result particularly in view of the lack of clear and specific language which would otherwise compel an employee to work against his will. It is difficult to believe that Section 8, the heart of which is to place "in the hands of the rank and file of American

in House (H. Rep. 531), 5723, 5726; debate by one of conferees, 5628; conference report agreed to in House, 5729–5737; conference report submitted in Senate, 5719; debated 5720-24, 5750, 5773–95, 5811; agreed to, 5795; examined and signed, 5798; to President, 5798; vetoed (S. Doc. 75), 6487; passed Senate over President's veto, 6489; passed House over President's veto, 6548, 6549 (Public #89).

4 "Section 6. Interference with government operation of plants.

"(a) Whenever any plant, mine, or facility is in the possession of the United States, it shall be unlawful for any person (1) to coerce, instigate, induce, conspire with, or encourage any person, to interfere, by lock-out, strike, slow-down, or other interruption, with the operation of such plant, mine, or facility, or (2) to aid any such lock-out, strike, slow-down, or other interruption interfering with the operation of such plant, mine, or facility by giving direction or guidance in the conduct of such interruption or by providing funds for the conduct or direction thereof or for the payment of strike, unemployment, or other benefits to those participating therein. No individual shall be deemed to have violated the provisions of this section by reason only of his having ceased work or having refused to continue to work or to accept employment."

labor the privilege and responsibility to decide of their own volition whether there shall be strikes"[5] was meant to deny the right of the individual to cease production—a right not denied even against the government.

The legislative history of the Smith-Connally Act, and the discussions in Congress, do not warrant the literal construction of Section 8(a) (2) for which the plaintiff contends.

The Smith-Connally bill (S. 796) as originally presented in Congress did not contain any provision similar to the present Section 8, but rather was directed to the taking-over and operation by the government of strike-bound plants. One of the numerous suggested amendments to that bill, the Taft amendment, did, however, set up a system similar to that embraced by Section 8. This included a provision using the same language as that in Section 8(a) (2) here in controversy. The colloquy between Senators Taft and Lodge on this matter merits recognition, and bears out the conclusion that Section 8 (a) (2) was intended to preserve the status quo and to provide a standard to determine whether the Act is violated, rather than to deprive individual employees of the power of ceasing production:

"Mr. Lodge: I should like to invite the Senator's attention to section 8, page 3, which contains the provision that—

" 'Whenever any labor dispute has been certified to the Board, or jurisdiction assumed on the Board's own motion, and until 10 days after the order of the Board has been issued the parties to the dispute shall continue production under all the same conditions which prevailed—'

And so forth. What is the binding effect of the three words, 'shall continue production?' How can obedience to that requirement be compelled?

"Mr. Taft: *I do not think there is any penalty, so to speak, in that case.* It is though Congress should say, 'While this is pending, the parties shall continue to work under the same conditions.' The important part of it is 'under all the same conditions which prevailed when the dispute arose, except as they may be modified by mutual agreement or temporary order of the Board.' That establishes the legal conditions. It establishes the effectiveness of section 4 of the Connally bill (the provision comparable to Section 6 of the Act).

"If then, anyone violates section 4 of the Connally bill, he makes himself liable to the penalties of section 4. *Insofar as legal effect is concerned, we could leave that out. It seems to me, however, to establish a definite legal condition, and it is important for us to state how the production shall be continued. Shall it be continued on the basis of the former collective-bargaining agreement, or shall it be continued on some other basis? The important thing is that during the pendency of the proceedings before the National War Labor Board there shall be some provision governing the relations of the parties.* I do not care what it may be. In the coal case it may be the collective bargaining which has expired, let us say." (Emphasis added)   (89 Cong.Record, p. 3972).

It is interesting to note that the language of the Taft amendment was adopted by the conferees, although the bill as it first passed the House[6] contained a differently worded provision, which the conferees deemed, in any event, to incorporate substantially the same policy in the Act.[7]

The discussions in Congress on the bill and on the many proffered amendments disclosed that the legislators, for the most part, zealously guarded the individual's right to cease production, as distinguished, at least, from concerted action induced by their union representatives.[8] Many felt not only that the bill did not operate to prevent an individual from leaving his position, but under the Constitution he could not be made to work.[9] Indeed, the fail-

[5] 89 Cong.Rec. 5732.
[6] 89 Cong.Rec. 5382.
[7] 89 Cong.Rec. 5728, 5729.
[8] See Cong.Rec. 3870, 5721, 5733 and 5792.

[9] E. g. Hearings before the Committee on Military Affairs of the House of Representatives on S. 796, 78th Cong. 1st Sess. (1943) 37; See 89 Cong.Rec. 3970.

ure of the bill, as finally agreed upon by the conferees, to accomplish aught in deterring individual workers from leaving their jobs was on one occasion inveighed against.[10] Particularly noteworthy is the fact that the formula adopted in Section 8 of the Act was patterned after the theory of the Railway Labor Act, 45 U.S.C.A. § 151 et seq.,[11] which contains express provisions militating against infringement of the right to cease work.[12]

Section 8 clearly imposes a duty upon the union representative of any group of employees to give notice of a labor dispute. It also, albeit impliedly, asserts that no strike may be called during the thirty-day "cooling-off" period, and it expressly leaves it to the employees to decide, without coercion or restraint, whether they shall engage in a strike. By this law Congress sought to avoid strikes called by irresponsible or "hot-headed" labor leaders, *and thus to keep war plants open to those who wished to work.*[13] To maintain continuity of production, it was further provided that, although there existed a dispute as to working conditions, during the period of negotiations or attempted settlements, the existing working conditions could not be changed, except as provided for. But Congress did not intend, at the time that S.796 was being considered and was enacted, to revoke the individual's right to leave his employment for his own reasons. In my judgment, such effect should not be discovered in implications or unfortunate choice of words for the consequence is serious enough to merit specific language, and to be enforced on that basis alone.

Accordingly, I am of the opinion that no action for damages will lie under Section 8 of the Act against the individual defendants by reason of their refusal to continue production during the thirty days succeeding the notice of a labor dispute given by the union representative.

Finally, paragraph seven of the Complaint alleges that "on or about October 31, 1946, the defendants wilfully incited all the other employees in the bargaining unit represented by District Lodge #1 of the International Association of Machinists, affiliated with the American Federation of Labor, to refuse to continue production * * *."

Aside from any question of the Constitutional protection of the right of free speech, it is sufficient to note that Section 8 of the Act does not, either expressly or impliedly, make it unlawful to commit the alleged acts attributed to the defendants in the quoted paragraph of the Complaint. Such action is prohibited by Section 6, supra, but that section is applicable only in the case where the operation of a plant has been assumed by the government. This is not the situation here. The paragraph, therefore, does not establish a cause of action upon which relief can be afforded.

For the foregoing reasons, it is concluded that the Complaint fails to state a cause of action entitling the plaintiff to damages pursuant to Section 8(c) of the War Labor Disputes Act, and it must be dismissed.

An order may be entered in accordance herewith.

---

[10] 89 Cong.Rec. 5753, 5754.
[11] 89 Cong.Rec. 5733.
[12] 45 U.S.C.A. §§ 153 (Second) and 159 (Eighth).

[13] See Sen.Rep.No.147, 78th Cong. 1st Sess. (1943) 2.