### HAMILTON v. NATIONAL LABOR RELATIONS BOARD.

### NATIONAL LABOR RELATIONS BOARD v. KALAMAZOO STATIONERY CO., DIVISION OF WESTERN TABLET & STATIONERY CORPORATION.

#### No. 10247.

Circuit Court of Appeals, Sixth Circuit.

March 31, 1947.

---

[11] Kamborian et al. v. United Shoe Machinery Corp., D.C.Mass.1945, 62 F.Supp. 903 at page 905.

Mozart G. Ratner, of Washington, D. C. (Gerhard P. Van Arkel, Morris P. Glushien, A. Norman Somers, Mozart G. Ratner and William J. Avrutis, all of Washington, D. C., on the brief), for National Labor Relations Board.

C. N. Sessions, of Muskegon, Mich. (C. N. Sessions, of Muskegon, Mich., on the brief), for Kalamazoo Stationery Co.

Victor E. Bucknell, of Kalamazoo, Mich., for Harold Hamilton.

Before ALLEN, MARTIN, and MILLER, Circuit Judges.

MILLER, Circuit Judge.

This case is before the Court upon petition of Harold Hamilton, an employee of Kalamazoo Stationery Company, Division of Western Tablet and Stationery Corporation, hereinafter referred to as Respondent, to review and set aside in part an order of the National Labor Relations Board. The Board filed an answer requesting that the relief prayed by the petitioner be denied in full and further requesting enforcement of the order in full, to which pleading the company-employer was made a respondent. Respondent concedes the Board's jurisdiction. The present proceedings are brought pursuant to Sections 10(e) and 10 (f) of the National Labor Relations Act, Sections 160(e) and 160(f) Title 29 U.S. C.A.

The Board's order required the respondent to cease and desist from discouraging membership in the International Brotherhood of Bookbinders, affiliated with the American Federation of Labor, a union which was gaining members and strength among the employees of the respondent, and in any other manner interfering with its employees in the exercise of their rights to self-organization and collective bargaining; that two employees, Abraham and Smith, who had been discharged for activities in connection with a strike at respondent's plant, be reinstated without prejudice to their seniority or other rights and privileges and be made whole for any loss of pay; and that the respondent post appropriate notices. It dismissed so much of the complaint as sought reinstatement of the petitioner Hamilton. In this connection, it found that the respondent had discriminated against Hamilton on account of his union membership and activity therein by confining him to the maintenance department and assigning him baser work, but that the layoff of Hamilton, prior to the strike, at a time when conditions compelled the company to lay off approximately seventy of its employees including Hamilton and other members of the Union, was not because of his union activity, but in accord with his seniority status and that no one had been employed by respondent in his stead. It is to set aside this portion of the order that Hamilton filed his petition to review.

The factual side of the case seems somewhat typical of controversies of this type, making it unnecessary to review the evidence in detail. But in order to properly present the several questions of law involved, we review briefly the facts pertaining to the strike which occurred on September 5, 1944, and which resulted in the refusal of the respondent to reinstate the two employees, Abraham and Smith. There is substantial evidence that the respondent discouraged the formation of the union, that it discriminated against Hamilton because of his union membership and activity, and that this attitude on its part towards the union activities led to a proposal on the part of the Union to call a strike. On the evening of September 1, 1944, following Hamilton's layoff, the Union held a special meeting and decided to

strike on September 5th. Cards were sent to its members notifying them to be on picket duty on that day. On September 3rd, Hamilton, Abraham and Smith were advised by a representative of another union that the strike would be illegal since it was called without the preliminary notice required by statute. They accordingly called the strike off, notifying employees to that effect by telephone and as they reported to the plant on the morning of September 5th. Nevertheless, rumors pervaded the plant that a strike would occur. During the work day of September 5th, Abraham, who customarily worked without much supervision, was given direct and continuous supervision by a foreman, Nason, who criticised his work. During the lunch hour Abraham discussed the situation with other employees and told them about the way Nason "was riding" him. During the afternoon Nason continued his critical supervision until about 4:00 p. m. when Abraham decided that he was "fed up" with the situation and began cleaning up his press preparatory to going home. Another employee, upon being advised by Abraham of what he was doing, told the other employees in the bindery that they were all going out. The word spread to other departments and numerous other employees joined the walkout. While the striking employees were standing nearby, McMahan, an officer of the respondent, walked up to the group and asked the reason for the walkout. Abraham told him that when the respondent took back 21 union members they had laid off they would return to work. McMahan told Abraham he was not coming back to work, and turning to Smith he told him he was discharged also. Attempts to settle the strike were unsuccessful, and finally the union, whose members were getting low on funds, was forced to call off the strike on condition that those who had not been laid off would be taken back without discrimination. On September 18th, the employees not discharged or laid off returned to work. Abraham and Smith were not reinstated.

The Board's findings that the respondent had engaged in unfair labor practices within the meaning of Section 8(1) and 8(3) of the Act are supported by substantial evidence and are conclusive. Section 10(e) of the Act. They support so much of its order as requires the respondent to cease and desist from discouraging membership in the union or in any other manner interfering with its employees in their rights to self-organization and to bargain collectively and to post appropriate notices. Likewise its finding with respect to the layoff and refusal to reinstate Hamilton is supported by substantial evidence and accordingly justifies the dismissal of the complaint as to Hamilton. So much of the order as requires the reinstatement of Abraham and Smith presents a different and more difficult question.

The respondent contends that so much of the Board's order as directed the reinstatement of Abraham and Smith with back pay is erroneous because said employees had forfeited the protection of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. for the following reasons: (1) While representing a minority of the employees they instigated and participated in a wildcat strike; (2) because they violated the provisions of the War Labor Disputes Act, Section 1501 et seq., Title 50 U.S.C.A.Appendix; and (3) because they violated the provisions of the Michigan State Labor Mediation Act, Michigan Stat.Ann. Vol. 12, c. 154, § 17.454(1) et seq., Comp.Laws Supp.1940, § 8628-1 et seq. We discuss each of these contentions in turn.

Section 2(3) of the National Labor Relations Act, Section 152(3), Title 29 U.S.C.A., provides that "The term 'employee' * * * shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment." In construing this section the Supreme Court has said "the plain meaning of the act is that if men strike in connection with a current labor dispute their action is not to be construed as a renunciation of the employment relation and they remain employees for the remedial purposes specified in the act." N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381. See also N. L.

R. B. v. Ohio Calcium Co., 6 Cir., 133 F.2d 721, 726; N. L. R. B. v. Clinton Woolen Mfg. Co., 6 Cir., 141 F.2d 753, 756. The Act, in recognizing the right to strike, contemplates a lawful strike, and is not to be construed as compelling employers to retain persons in their employ regardless of their unlawful conduct in conducting the strike. If an employee engages in such conduct as would justify an employer in discharging him if a strike was not in effect, there is nothing in the Act to prevent such a discharge. N. L. R. B. v. Fansteel Corp., 306 U.S. 240, 254, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, through 256; N. L. R. B. v. Ohio Calcium Co., supra. But the right to discharge a striker engaged in unlawful acts by refusing to reinstate him after the end of the strike is entirely different from refusing to reinstate a striking employee because of his activity in instigating and participating in the strike. Discrimination in reinstating striking employees because of their activity in connection with the strike is prohibited by Section 8 of the Act. N. L. R. B. v. Mackay Radio & Telegraph Co., supra (304 U.S. 333, 346, 347, 58 S.Ct. 904, 82 L.Ed. 1381). The respondent in its answer to the petition of the Board for enforcement of its order states that Abraham and Smith were leaders and instigators of an unlawful strike "and as such leaders and instigators they were properly discharged by said company." But Section 13 of the Act, Section 163, Title 29 U.S.C.A., provides that nothing in the Act "shall be construed so as to interfere with or impede or diminish in any way the right to strike." The strike was not accompanied by violence or threats. Refusal on the part of the respondent to reinstate Abraham and Smith because of their participation in the strike was not justified. Respondent relies upon N. L. R. B. v. Brashear Freight Lines, Inc., 8 Cir., 119 F.2d 379 and N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199, 156 A.L.R. 989. In the Brashear Freight Lines case a minority of the employees struck because the employer refused to bargain with their representative. The Court ruled that there was no legal obligation to bargain with the representative of a minority and the strike was ac-

cordingly illegal. In the Draper case the Court held that the strike was illegal because the striking employees were guilty of interfering with the collective bargaining which was being carried on by their duly authorized agent in violation of the collective bargaining agreement entered into with the company. Such cases are similar in effect to the ruling in N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682, where the Court held that the striking employees lost their status as employees because the strike was called in violation of the terms of the contract between the Union and the Company. We recognize the right of the employer to discharge employees who strike in violation of their contractual obligations with the employer or in violation of the provisions of the Act. But such factors are not present in this case.

 We consider next whether Abraham and Smith violated the provisions of the War Labor Disputes Act of June 25, 1943, Section 1501 et seq., 50 U.S.C.A. Appendix, and if so, did such violation deprive them of their rights under the National Labor Relations Act. Section 6 of that Act deals with any plant, mine or facility in possession of the United States, and makes it unlawful for any person to instigate or encourage any person to interfere by strike or other interruption with the operation of such facility or to aid in any such interruption by giving direction or guidance, or by providing funds therefor. It provides that "No individual shall be deemed to have violated the provisions of this section by reason only of his having ceased work or having refused to continue to work or to accept employment." Section 6, so dealing with facilities in the possession of the United States, is not applicable to the present case, except insofar as a consideration of it provides aid in the correct construction to be given to Section 8 of the Act. Section 8 of the Act deals with companies engaged in war production, as in the present case. Section 8(a) provides that in order that the President may be apprised of labor disputes which threaten seriously to interrupt war production, and in order that employees may have an opportunity to express themselves free

from restraint or coercion as to whether they shall permit such interruption in war time, (1) the representative of the employees shall give to the Secretary of Labor, the National War Labor Board, and the National Labor Relations Board notice of any labor dispute together with a statement of the issues giving rise thereto; (2) "For not less than thirty days after any notice under paragraph (1) is given, the contractor and his employees shall continue production under all the conditions which prevailed when such dispute arose, except as they may be modified by mutual agreement or by decision of the National War Labor Board"; and (3) that on the thirtieth day after such notice the National Labor Relations Board shall take a secret ballot of the employees on the question whether they will permit any such interruption of war production, certify the results of such balloting and make such results open to public inspection. Section 8 (c) provides "[that] any person who is under a duty to perform any act required under subsection (a) and who willfully fails or refuses to perform such act shall be liable for damages resulting from such failure or refusal to any person injured thereby and to the United States if so injured. * * *" The Board contends that the provisions of Section 8 do not deny to the employees the right to discontinue work during the thirty days cooling-off period, and that accordingly Abraham and Smith did not violate any provision of Section 8 of the Act when they ceased work as they did on September 5, 1946. It relies strongly upon the ruling in France Packing Co. v. Dailey, D.C.E.D.Pa., 67 F.Supp. 841, and the reasons expressed in the opinion in that case, particularly the legislative history of the Act as therein referred to. We have difficulty agreeing with that conclusion. The Act specifically provides that during the cooling-off period the contractor and his employees "shall continue production under all the conditions which prevailed when such dispute arose." The phrase "shall continue production" is not ambiguous. It is the exact opposite of discontinuing production or discontinuing the work which results in production. The Act requires not only that the contractor continue production, but also that the employees continue production. The employees can not be permitted to discontinue work and at the same time be required to continue production. Section 6 of the Act, dealing with Government operation of plants, specifically preserves to the employees by a separate sentence the right to cease work, but such a reservation of right is omitted from Section 8 dealing with war production under a war contractor. Such an intentional omission is significant and important. Compare United States v. Atchison, Topeka & Santa Fe R. Co., 220 U.S. 37, 44, 31 S.Ct. 362, 55 L.Ed. 361; Wine v. Commonwealth, 301 Mass. 451, 17 N.E.2d 545, 120 A.L.R. 889, 894. The essential purpose of Section 8 is to prevent interruptions to war production; this purpose is defeated if the Act permitted employees to discontinue work during the cooling-off period. It is another purpose of the Act that the employees participate in a secret ballot during the cooling-off period to determine whether or not any interruption to the war production should take place; this purpose is also defeated if individual employees, regardless of their number, are permitted to cease work before such a ballot is taken, and irrespective of any result of such balloting. In short, a construction of the section which authorizes the employees to quit work during the cooling-off period runs diametrically counter to the fundamental purpose of the Act, which is to continue production during a 30-day period regardless of the labor dispute involved. The construction which we give to the provisions of the Act that the employees shall continue production, namely, that employees are not permitted to cease work during the 30-day cooling-off period, does not violate any constitutional rights when considered as an incident of the exercise by Congress of its war powers in furtherance of the war effort. Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 389, 390, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856. See also Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305. The Act is civil, not criminal, in its nature, imposing damages, not confinement, for its violation.

█ But it does not follow that a violation of Section 8 of the War Labor Disputes Act deprives an employee of his rights under the National Labor Relations Act. There is no provision in the War Labor Disputes Act to that effect. Section 10 of the National Labor Relations Act specifically recognizes the right of the employee to strike. It deals with employment generally, not merely war production. The War Labor Disputes Act is limited to war production and is not an attempt to amend or modify the National Labor Relations Act. Its legislative history shows that 'it was not intended to curtail in any way the rights and protection accorded employees under the National Labor Relations Act. The Act as originally passed in the House provided that violators should forfeit their rights under the National Labor Relations Act. This provision was not approved by the Senate and the revised bill which later became the law did not contain such a penalty. In the debates which followed submission of the Conference Committee Report it was made clear employees' rights under the National Labor Relations Act were not affected. See 89 Cong.Rec. 5304, 5305, 5326, 5327, 5382, 5392, 5730, 5732, 5733; H.Rep. No. 531, 78th Cong. 1st Sess. pp. 5, 9. With this legislative history before us we can not give to the Act the construction contended for by the respondent.

█ The respondent finally contends that Abraham and Smith forfeited the protection of the National Labor Relations Act by their noncompliance with the cooling-off provisions contained in the Michigan State Labor Mediation Act, Michigan Stat.Ann. Vol. 12, c. 154, § 17.454(1) et seq., Comp.Laws Supp.1940, § 8628-1 et seq. It is provided by that Act that in the event a dispute arises and the parties thereto are unable to settle the same, no strike shall take place unless the employees or their representative shall serve a notice upon the State Board of such dispute, together with a statement of the issues involved, and that for a period of not less than five days after the notice is served, it shall be the duty of both employees and employers to use their best efforts to avoid a cessation of employment, and during such period the parties shall undertake a mediation thereof. Violation of the Act is a misdemeanor and punishable as such. The required notice was not given in the present case, nor was the cooling-off period observed. However, the Act does not provide that such striking employees lose their status as employees or the right to reinstatement. The Act has not been so construed by the Supreme Court of Michigan. In the absence of a construction of the Act by that Court, we would be reluctant to construe it in this case, unless necessary to reach a decision. Compare Spector Motor Co. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101. We find it unnecessary to construe the Michigan Act in this case. If the Act, as properly construed, means that an employee violating its provisions may not be lawfully discharged for such activity, respondent's contention fails. On the other hand, a construction authorizing the discharge of strikers who failed to give the required notice and failed to observe the cooling-off period conflicts with the provisions of the National Labor Relations Act and would not be applicable in this case. The Federal Act does not require the giving of notice of a pending dispute followed by a cooling-off period. Where the enforcement of a state statute impairs, qualifies or in any respect subtracts from any of the rights guaranteed by the National Labor Relations Act, such provisions are ineffective to the extent of such conflict. Hill v. Florida, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782. Compare Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154. We are accordingly of the opinion that that part of the order of the Board requiring the reinstatement of Abraham and Smith is not erroneous.

The petition of Hamilton to set aside in part the order complained of is denied. A Decree of Enforcement of the order as a whole should be entered.