## FRANCE PACKING CO. v. DAILEY et al.
### No. 9307.

Circuit Court of Appeals, Third Circuit.

Argued April 22, 1947.

Reargued Oct. 17, 1947.

Decided Feb. 16, 1948.

752

O'CONNELL, Circuit Judge, dissenting, and BIGGS, Circuit Judge, dissenting in part.

———◇———

C. Tracy Taylor, of Philadelphia, Pa., (Ronald Souser and Souser, Schumacker Taylor, all of Philadelphia, Pa., on the brief), for appellant.

Ellis Lyons, of Washington, D. C., for the United States, Intervenor.

Robert Hackenberg, of Philadelphia, Pa., for appellee.

Before BIGGS, MARIS, GOODRICH, McLAUGHLIN, and O'CONNELL, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The plaintiff appeals from an order of the District Court dismissing its complaint on the ground that it fails to state a cause of action under Section 8(c) of the War Labor Disputes Act.[1] The District Court opinion is found in 67 F.Supp. 841, 845.

The complaint alleges that appellant is a Pennsylvania corporation which during the relevant period manufactured metal packing for the United States Navy, United States Army and/or the United States Maritime Commission. The appellees are stated to have been at the time of their cessation of production and at the time of their instigation of cessation of production, employees of appellant and representatives of the employees within the meaning of Section 2(d) of the Act. It is said that on or about October 24, 1945 the representa-

---

[1] Act of June 25, 1943, c. 144, 57 Stat. 167, 50 U.S.C.A. Appendix, § 1501 et seq. Section 8 reads in part as follows:

"(a) In order that the President may be apprised of labor disputes which threaten seriously to interrupt war production, and in order that employees may have an opportunity to express themselves, free from restraint or coercion, as to whether they will permit such interruptions in wartime—

"(1) The representative of the employees of a war contractor, shall give to the Secretary of Labor, the National War Labor Board, and the National Labor Relations Board, notice of any such labor dispute involving such contractor and employees, together with a statement of the issues giving rise thereto.

"(2) For not less than thirty days after any notice under paragraph (1) is given, the contractor and his employees shall continue production under all the conditions which prevailed when such dispute arose, except as they may be modified by mutual agreement or by decision of the National War Labor Board. * * *

"(c) Any person who is under a duty to perform any act required under subsection (a) and who willfully fails or refuses to perform such act shall be liable for damages resulting from such failure or refusal to any person injured thereby and to the United States if so injured. * * *"

tive union of appellant's employees filed a notice of a labor dispute as provided by Section 8(a) (1) of the Act. The complaint goes on to say that on or about October 31, 1945 the appellees being persons under a duty to perform acts required by Section 8(a) of the Act wilfully refused to continue production and wilfully incited all the other employees in the bargaining unit to refuse to continue production to the damage of appellant.

The complaint as drawn follows the Act and the meticulous use of the statutory language may be assumed to allege a strike. Whether the defendants were actually striking or were abandoning their positions completely is of course not as yet an issue.

■ Taking the complaint at its face value, as must be done on such a motion, the District Court, concluding that the appellees had not wilfully failed in or refused to perform any duty imposed upon them by Section 8(a), held, "that no action for damages will lie under Section 8 of the Act against the individual defendants by reason of their refusal to continue production during the thirty days succeeding the notice of a labor dispute given by the union representative." The language of 8(a) (2) that "the contractor and *his employees* shall continue production * * *" (Emphasis added) was said by the court to "afford no basis of distinction upon the reasons impelling the individual worker to leave his post, except perhaps if the employee's act is part of a concerted strike: but even then the distinction is of doubtful validity, * * *." With reference to the charge in the complaint that the appellees wilfully incited all the other employees to refuse to continue production, the lower court found such conduct not unlawful either expressly or impliedly under Section 8.

Support for its decision was found by the court below in the Constitutional protection against involuntary servitude; in the legislative history of the War Labor Disputes Act; and in the lack of a similar provision in Section 6 of the same Act which applies to government seized plants and provides criminal punishment for inciting work stoppages therein but does not mention any sanctions for actual cessation of work.

■ The contention that a limitation of the right to strike under the specified narrow conditions of Section 8 partakes of involuntary servitude is not substantiated by the cases. To the contrary, there is a wide distinction between a worker quitting his job, for any reason or no reason, on the one hand, and a cessation of production by workers who seek to win a point from management, on the other hand. The Act here to be construed, in Section 2, adopted its definitions of employee from the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., not then affected at all by the recent Taft-Hartley Act, 29 U.S.C.A. § 141 et seq. Section 2 (3) of the N.L.R.A., 29 U.S.C.A. § 152(3), described a striker as still an employee. Constructing that very definition, the Supreme Court in N.L.R.B. v. Mackay Radio & Telegraph Co., 304 U. S. 333, at page 345, 58 S.Ct. 904, at page 910, 82 L.Ed. 1381, said:

"The strikers remained employees under Section 2(3) of the Act, 29 U.S.C.A. § 152 (3), which provides: 'The term "employee" shall include * * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, * * *.' Within this definition the strikers remained employees for the purpose of the act and were protected against the unfair labor practices denounced by it."

Again, 304 U.S. at page 347, 58 S.Ct. at page 911, 82 L.Ed. 1381, the court said:

"The respondent insists that the relation of employer and employee ceased at the inception of the strike. The plain meaning of the act is that if men strike in connection with a current labor dispute their action is not to be construed as a renunciation of the employment relation and they remain employees for the remedial purposes specified in the act. We have held that, in the exercise of the commerce power, Congress may impose upon contractual relationships reasonable regulation calculated to protect commerce against threatened industrial strike. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 48, 57 S.Ct. 615,

629, 1 L.Ed. 893, 108 A.L.R. 1352. The Board's order there sustained required the reinstatement of discharged employees. The requirement interfered with freedom of contract which the employer would have enjoyed except for the mandate of the statute. The provision of the act continuing the relationship of employer and employee in the case of a strike as a consequence of, or in connection with, a current labor dispute is a regulation of the same sort and within the principle of our decision."

And see N.L.R.B. v. Fansteel Co., 306 U. S. 240, 256, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; N.L.R.B. v. Ohio Calcium Co., 6 Cir., 133 F.2d 721, 726. A quite similar situation is presented by Texas & N.O.R. Co. v. Ry. Clerks, 281 U.S. 548, 50 S.Ct. 427, 432, 74 L.Ed. 1034, which upheld the Railway Labor Act of 1926, 44 Stat. 577, 45 U.S.C.A. § 151 et seq. The court there agreed that "the major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes.'" It approved Section 10 of that Act which stated that "after the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." Regarding this the court through Chief Justice Hughes said, 281 U.S. at pages 566, 567, 50 S.Ct. at page 432, 74 L. Ed. 1034:

"The provision of section 10 is to be read in connection with the qualification in subdivision eighth of Section 9 that nothing in the act shall be construed to require an individual employee to render labor without his consent or as making the quitting of service by an individual employee an illegal act, and that no court shall issue any process to compel the performance by an individual employee of labor without his consent. The purpose of this limitation was manifestly to protect the individual liberty of employees and not to affect proceedings in case of combinations or group action. The denial of legal process in the one case is significant with respect to its expected, appropriate use in the other."

Much to the same effect is Wilson v. New, 243 U.S. 332, 359, 37 S.Ct. 298, 306, 61 L.Ed. 755, L.R.A.1917E, 938, Ann.Cas. 1918A, where in sustaining the Eight Hour Day Act of 1916, 39 Stat. 721, 45 U.S.C.A. §§ 65, 66, the Supreme Court held that Congress had the power "to provide by appropriate legislation for compulsory arbitration."

In brief, the restricted limitation of the right to strike, in this Act, refers to circumstances involving a continuing master and servant relationship. There is no involvement here with the distinct—and unquestioned—right of the worker to quit his job or the right of the employer to discharge him for cause. In this situation we fail to see any true constitutional question in this case.

The court below in concluding that the record of Congressional discussion at the time of the statute's passage shows the section in question was meant only to apply to employers, relied greatly upon a statement by Senator Taft on the floor of the Senate. Senator Lodge had come upon a "continue production" phrase in a proposed part of the bill which would have made it a crime for a worker to strike during a certain period in a private plant producing war material. He wanted to know if there was criminal punishment for such a discontinuance. Senator Taft replied, at page 3972 of Part 3, Volume 89 of the Congressional Record, "I do not think there is any penalty, so to speak, in that case." He then said that the clause continued previous agreements for labor-management relations during any then current dispute. However, the whole section of which he spoke failed of passage and never became law. Cong. Rec., Vol. 89, Part 3, p. 3984.

The bill which actually did become law and which is before this court for construction was an amendment originally in somewhat different form proposed by Representative Harness. Cong. Rec. Vol. 89, Part 4, p. 5328. As first proposed, this amendment attempted, during a cooling-off period after the rise of a labor dispute in a war production plant, to make it "unlawful for a * * * contractor to conduct a lock out * * * for employees * * * to strike * * *." Commenting on this proposal, Representative Harness said his bill "would apply to labor unions or individuals of la-

bor unions. Anyone who was damaged as the result of a strike in violation of this Act would be entitled to file a civil suit for damages." Cong. Rec., Vol. 89, Part 4, p. 5329. It is to be noted that this discussion was of civil damages, whereas Senator Taft, as quoted above, was talking about criminal penalties in his suggested law. The Harness proposal was passed by the House. Cong. Rec., Vol. 89, Part 4, p. 5391. A conference committee of the two houses then changed it to its final form; but Mr. Harness considered his original meaning remained and that "no strike or interruption of production shall be permitted for a period of 30 days * * *." Cong. Rec., Vol. 89, Part 4, p. 5732.

█ It is true that on occasion Congressman Harness seemingly contradicted himself. It is to be noted, however, that his statements above quoted and consistent with the wording of the Act were made later than any statements by him to the contrary prior to its passage. Certainly it is plain that the legislative history of the statute in its entirety does not sustain the proposition that Congress did not intend to touch the right to strike. And even assuming that the history of itself does not conclusively show that said right was to be affected, the final statutory language is so plain it needs no such collateral support. "Construction may not be substituted for legislation." United States v. Missouri Pac. R. Co., 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322. "To let general words draw nourishment from their purpose is one thing. To draw on some unexpressed spirit outside the bounds of the normal meaning of words is quite another." Addison v. Holly Hill Co., 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488, 153 A.L.R. 1007. Cf. Crossett Western Co. v. Commissioner, 3 Cir., 155 F.2d 433, 437, and the remarks of Judge Maris in Suwannee Fruit & St. S. Co. v. Fleming, Em.App., 160 F.2d 897, 898.

The fact that there are no civil penalties contained in Section 6 for striking from a government operated war plant weighed heavily with the District Court, but this cannot be said to control the present situation *because such penalties are expressly contained in Section 8.* Nor does there appear any sound reason for concern over the alleged inconsistency between Sections 6 and 8. Indeed, when it is recalled that Section 6 involves criminal penalties, its sharp limitations as compared with Section 8 shape up as reasonable.

█ It does seem therefore that the national security measure under consideration applies to employers and employees alike in their fundamental obligation as citizens functioning in a wartime emergency and that the ordinary meaning of the words of Section 8 should be recognized as referring to both groups. As stated by Judge Miller in Hamilton v. N.L.R.B., 6 Cir., 160 F.2d 465, at page 470:

"The Act specifically provides that during the cooling-off period the contractor and his employees 'shall continue production under all the conditions which prevailed when such dispute arose.' The phrase 'shall continue production' is not ambiguous. It is the exact opposite of discontinuing production or discontinuing the work which results in production. The Act requires not only that the contractor continue production, but also that the employees continue production. The employees cannot be permitted to discontinue work and at the same time be required to continue production. Section 6 of the Act, dealing with Government operation of plants, specifically preserves to the employees by a separate sentence the right to cease work, but such a reservation of right is omitted from Section 8 dealing with war production under a war contractor. Such an intentional omission is significant and important * * *. [Citing cases] The essential purpose of Section 8 is to prevent interruptions to war production; this purpose is defeated if the Act permitted employees to discontinue work during the cooling-off period. It is another purpose of the Act that the employees participate in a secret ballot during the cooling-off period to determine whether or not any interruption to the war production should take place; this purpose is also defeated if individual employees, regardless of their number, are permitted to cease work before such a ballot is taken, and irrespective of any result of such balloting. In short, a construction of the section which authorizes the employees to quit

work during the cooling-off period · runs diametrically counter to the fundamental purpose of the Act, which is to continue production during a 30-day period regardless of the labor dispute involved. The construction which we give to the provisions of the Act that the employees shall continue production, namely, that employees are not permitted to cease work during the 30-day cooling-off period, does not violate any constitutional rights when considered as an incident of the exercise by Congress of its war powers in furtherance of the war effort. * * * [Citing cases] The Act is civil, not criminal, in its nature, imposing damages, not confinement, for. its violation."

Regarding the further charge in the complaint that appellee wilfully incited all the other employees of the bargaining unit to refuse to continue production, the District Judge correctly states that Section 8(c) does not make it unlawful to commit that type of act. It is also a fact that Section 6 in dealing with government seized plants does expressly prohibit such conduct. In the circumstances it must be fairly accepted that the Congress simply did not intend such provision to be included in Section 8. This, however, does not defeat the claim clearly pleaded against the appellees for their own wilful refusal to continue production. It is stated that the allegation as to the appellees wilfully inciting all the other employees to refuse to continue production was made because appellant felt, as the District Court states in the opinion [67 F.Supp. 845], that Section 8 impliedly "asserts that no strikes may be called during the thirty-day 'cooling-off' period," and because such allegation is of considerable assistance to appellant in presenting and making out a cause of action on the primary charge. There may be enough merit to the latter contention to justify retention of the allegation in the complaint for that stated purpose; but that question has to do with amendment of the complaint and is for the District Court.

It should be noted that the suit is against three individuals and not against the union of which they are officers. The statute, in terms, permits this, so that its propriety at this stage of the litigation cannot be gainsaid. Any defense on this point will be passed upon in due course by the trial court. Our present decision is simply that the complaint does state a cause of action against appellees for their alleged wilful refusal to continue production.[2]

The judgment of the District Court will be reversed and the case remanded to that court for further proceedings not inconsistent with this opinion.

BIGGS, Circuit Judge (concurring in part, dissenting in part).

I concur in the views expressed in the majority opinion respecting the construction of the War Labor Disputes Act, concluding as does the majority, that the complaint charges the defendants with participating. in collective action amounting to a strike. The majority opinion, however, referring to "the restricted limitation of the right to strike" contained in the Act, states that "In this situation we fail to see any true constitutional question in this case." The opinion relies, to some degree at least, on a purported analogy between Section 10 of the Railway Labor Act of 1926, 45 U.S.C.A. § 160, and Section 8 of the War Labor Disputes Act. I think that there is no analogy because no provision of the Railway Labor Act imposes sanctions on an employee in any wise comparable to those contained in Section 8 of the War Labor Disputes Act.

I think that serious constitutional questions may be involved in the instant case. It would be improper, however, for a court to attempt to determine such questions except in due course and on issues raised by the pleadings. Polk Co. v. Glover, 305 U.S. 5, 9-10, 59 S.Ct. 15, 83 L.Ed. 6; Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 211–213, 55 S.Ct. 187, 79 L.Ed. 281.

For these reasons I am of the opinion that the judgment of the court below dismissing the suit was in error.

---

[2] In the present posture of this litigation, we do not see that we are concerned with attempting to anticipate possible difficulties, if any, plaintiff may experience with its proof as to damages.

O'CONNELL, Circuit Judge (dissenting).

In explaining my reasons for dissenting from the conclusions reached by the majority of the court, I should like to stress several facts: (1) Plaintiff is not under Government operation, but is engaged in manufacture and sale for private profit; (2) the Complaint, based solely upon the War Labor Disputes Act, 50 U.S.C.A.Appendix, § 1501 et seq., contains no allegation that defendants were other than employees at will, and (3) defendants apparently are being sued as individuals. Two issues are raised: (1) Does the statute give to a private employer the right to damages against an employee who goes out on strike before the 30-day statutory period has elapsed? and (2) if so, is the statute constitutional?

In United States v. Petrillo, 1947, 332 U. S. 1, 67 S.Ct. 1538, the Supreme Court again ruled that constitutionality of a statute would be passed upon only where the decision of a precise constitutional question is a necessity; consequently, in the present posture of this case, the question of the validity of Section 8 of the War Labor Disputes Act must be limited to the question whether it is constitutional on its face. I believe it unnecessary to consider even this question for, like the court below, I believe that a negative answer to the first issue requires dismissal of the Complaint.

I consider persuasive both the reasoning and conclusion of the lower court; namely, that the clause "shall continue production under all the conditions which prevailed when such dispute arose" was not intended to apply, and does not apply, to individual employees. The remarks which follow are intended only as supplementary to those of the court below.

The majority of this court has found that Section 8 of the War Labor Disputes Act is substantially the same as the amendment which was initially introduced by Representative Harness of Indiana and passed by the House of Representatives. While it is true that no comparable provision was included in the bill previously passed by the Senate (S. 796), the conference version which subsequently became law appears to me to differ measurably, both in language and in substance, from the Harness amendment. For example, the clause "shall continue production under all the conditions which prevailed" is almost verbatim the language Senator Taft had unsuccessfully proposed, while it can at best be only inferred from the Harness amendment; and Section 3 of the Harness amendment, making it "unlawful for employees of a war contractor to strike" before certification of the election by secret ballot, seems to have no specific counterpart in the conference bill.

Moreover, it is important to note the background of the War Labor Disputes Act. Congressional debate of the bill throughout clearly indicates that attention was focused upon the provisions dealing with work stoppages in facilities under Government operation, with little or no consideration given to difficulties in privately operated plants.[1] The bill itself met such strong press criticism as "haphazard," a "hastily put together hodge-podge," and a "hasty, ill-considered and confused measure."[2] With these facts in mind, I consider it difficult to link up the bill we now know as the Smith-Connally Act with an amendment which was written the same day as it was introduced[3] and which amendment changed radically the bill reported out by the House Committee on Military Affairs.

---

[1] Senator Connally, leader in the passage of the bill, described the provisions of Section 8 as "incidentals." 89 Cong. Rec. page 6488.

[2] See editorials in June 7, 1943, June 14, 1943, and June 26, 1943, issues of the New York Times.

In this connection, another excerpt from the June 14, 1943, editorial seems most appropriate: "A Congress that hurriedly frames or accepts such ambiguous legislation has a poor excuse to complain later about 'judge-made' law."

[3] 89 Cong.Rec. page 5330:

"Mr. Sadowski: What action did the gentleman's committee take on his substitute [the Harness amendment] when it was presented to the committee?

"Mr. Harness: I did not offer it as a substitute in committee.

"Mr. Sadowski: Why not, may I ask?

"Mr. Harness: Because I just got it written this morning."

Even if it be assumed that the Harness amendment was the progenitor of Section 8, however, I have considerable doubt whether, as stated in the majority opinion, that amendment was intended or designed to forbid individual employees from striking during the 30-day period. Language tending to support the conclusion of the majority of this court is quoted in the majority opinion; but other statements made by Representative Harness seem to me even more illuminating. On June 3, 1943, while the legislation was being considered on the floor of the House of Representatives, the following colloquy took place between Representatives Harness and Elmer:

"Mr. Elmer: Could this House pass a measure that would compel me to work for some other man, if I did not want to work for him?

"Mr. Harness: Why, certainly not. That is slave labor, and *I will not even consider that as a possible necessity.* American Labor is patriotic, and will coöperate with the Government in wartime. We will accomplish much more if we depend upon *voluntary coöperation,* rather than coercion.

"Mr. Elmer: If you take away the right to strike, *or if you delay the right to strike,* then to that extent you have introduced involuntary servitude, have you not, and that is forbidden by the Constitution.

"Mr. Harness: Of course." [4]

Again, in the course of a radio address delivered while the conference bill was awaiting action by President Roosevelt, Representative Harness said:

" * * * Because this provision [Section 6(b) of the War Labor Disputes Act, 50 U.S.C.A. Appendix, § 1506(b)] might mistakenly be interpreted to mean that an individual will be unable to quit his job if he so desires, let me assure you that *there is nothing in this provision, or anywhere else in this act, that could possibly be interpreted to force an individual to work against his will.* * * * I would be the last to deny the individual the *right to strike any time,* in war or in peace, except against the Government. *This act does recognize that individual right,* as I think we always must, if we are not to descend into slave labor. * * * " [5]

In the light of the foregoing comments, I cannot agree with the conclusion that striking on the part of individual workers was the target of Section 8. It seems to me more likely that Congress, constantly reminded of the ban on involuntary servitude and consistently voicing faith in the reasonableness and patriotism of the individual workingman, drafted Section 8 with a view to preventing interruptions to war production *induced by restraint or coercion.* [6]

Moreover, I find difficulty in attempting to apply the interpretation laid down by the majority of this court, where the question of damages is considered. An employer may be able to calculate the financial loss he has suffered as the result of a work stoppage; but, where more than one employee has ceased work, how can the liability of each be apportioned? The statute, as interpreted by the majority, sets forth no standard for determination of the allocation of financial responsibility. I consider the conclusion irresistible that Section 8(c) can, and was intended to, apply only to a group of employees rather than to an individual employee, and consequently that the instant Complaint does not state a cause of action upon which recovery may be had.

For the reasons stated, I believe the judgment of the court below should be affirmed.

---

[4] 89 Cong.Rec. page 5308; emphasis supplied. See also the highly relevant comments of Representative Elmer, 89 Cong.Rec. page 5321, and of Senator LaFollette, 89 Cong.Rec. page 5782.

[5] 89 Cong.Rec. page A3051; emphasis supplied.

[6] In Hamilton v. N. L. R. B., 1947, 6 Cir., 160 F.2d 465, the court held that violation of the War Labor Disputes Act does not deprive an employee of his rights under the National Labor Relations Act. The excerpt from that case quoted in the majority opinion, as I analyze it, was a dictum not necessary to the decision; for that court would have reached the same result even if it had been assumed arguendo that there had been a violation of the War Labor Disputes Act. In so far as the thoughts expressed in that dictum are inconsistent with my analysis of the applicable law, I respectfully disagree.