## NATIONAL LABOR RELATIONS BOARD v. UNITED STATES COLD STORAGE CORP.

### No. 14035.

United States Court of Appeals
Fifth Circuit.
April 23, 1953.

H. T. Bowyer and H. Bascom Thomas (of Bowyer, Gray, Thomas, Crozier & Harris), Dallas, Tex., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

BORAH, Circuit Judge.

The National Labor Relations Board petitions for a decree of enforcement of its order of October 29, 1951, against the respondent United States Cold Storage Corp., following the usual proceedings under § 10 of the National Labor Relations Act, 29 U.S.C.A. § 160. Jurisdiction is conceded.

The respondent, a Delaware corporation, operates cold storage plants throughout the United States including a plant in Dallas, Texas in which it processes, packs and stores divers food products. The respondent employs an average of sixty-five employees at all times and of this number, the seven employees in the engineering department are the only ones involved in this proceeding. On December 14, 1949, following an election held in the previous month among the employees of this department a majority of the votes cast were for the Stationary Engineers, Local 707, International Union of Operating Engineers, A. F. L., and the Board certified the union as the bargaining agent of the employees in the engineering department of respondent's Dallas plant. During the period January 9, 1950, to April 3, 1950, respondent and the union engaged in bargaining negotiations and, after sixteen different meetings were held, an agreement was substantially reached on everything except wages and seniority. On April 5, 1950, the union called a strike and established a picket line at the plant from that date until June 23, 1950, when the union withdrew the pickets.

On April 6, 1950, the respondent sent a telegram to each striking employee reading as follows: "We consider the strike illegal since at no time did the company refuse to bargain. Under the circumstances we would like you to report back to your regular job within 24 hours after receiving this telegram on your regular shift

Arnold Ordman, Attorney, A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, George J. Bott, General Counsel, Thomas McDermott, Attorney, National Labor Relations Board, all of Washington, D. C., for petitioner.

time. If you do not report, we will consider that you are terminating your employment and a replacement will be hired." The striking employees refused to abandon the strike and return to work and in consequence their discharge became effective on the day following receipt of the telegram. Having thus effectively discharged the strikers respondent thereafter began to hire new employees to fill the vacant jobs and by April 12, three new employees had been hired. Thereafter, on April 24, 1950, respondent addressed a letter to each of the strikers regarding his insurance and gave each of them the right to get individual policies with the Travelers Insurance Company, which was then carrying the group insurance. This letter contained this pertinent language: "On April 6th, we notified you by telegram to return to work within 24 hours from the receipt of the message or we would terminate the employment. You did not return to work; and consequently we consider you are no longer an employee of the company."

In a letter dated May 1, 1950, the union informed respondent that it considered the discharge of the employees, as set forth in the aforementioned telegram and letter of April 24, discriminatory and in violation of Section 8(a) (3) of the Act, 29 U.S. C.A. § 158(a) (3), and advised that it had filed an unfair labor practice charge alleging such unlawful discrimination and was seeking remedy before the Board. In this communication the union notified respondent of its intention to intensify its strike activities; requested respondent to reconsider its action in refusing to bargain and in locking out the discharged employees; and said: "We stand ready to meet and bargain with you in good faith at any time, and the employees insist on being restored to employee status at once." In response to this letter respondent wrote the union on May 8, stating that there had been no discrimination against the strikers on account of any union activity and that the strikers had not been locked out but that they had voluntarily left their jobs and had refused to return to work when an unconditional offer was afforded them. In this letter respondent informed the union that it had secured replacements for some of the men and at the present time could re-employ one operating engineer and two maintenance men and that as far as the other former employees were concerned they could make application for employment and would be re-employed when vacancies occurred. In the closing paragraph of this letter respondent said: "If you desire to continue negotiations, if you will submit any proposition you have to make in writing it will be considered by the Company at any time." Several days after receipt of this letter two of the striking employees applied for the available jobs and were re-employed. The remainder of the men on strike never applied for re-employment.

Agreeable to respondent's offer to consider any proposition which the union would submit in writing, the union on May 20, 1950, submitted a proposed agreement and notified respondent that it stood ready at any time to meet with it for the purpose of negotiations. Despite the fact that the union in this proposed contract reduced its demands for wages which had been one of the major issues in the pre-strike bargaining negotiations, respondent found the contract unacceptable and again ignored the union's request to meet for the purpose of negotiations; advised the union that it could not agree to the schedule of wages or to other specified provisions of the contract; and stated that if the union cared to revise the contract in line with the respondent's stated suggestions and resubmit it, respondent would be glad to consider it. On the day following the union answered again expressing a willingness to meet with respondent by "personal contact" in an effort to reach a satisfactory agreement, stating that it would be agreeable to any date designated by respondent.

On June 19, respondent specifically declined to meet with the union on the ground that the matters about which there is any substantial difference had been thoroughly discussed and it did not believe that there was any further need for discussions in person of these subjects. It again reiterated that if the union wished to revise its

ideas on these issues and would submit them they would be considered. On June 20, the union for the fourth time requested a personal appointment so they could sit down and reach an agreement for the benefit of all concerned. This letter respondent ignored.

The trial examiner found that the respondent did not engage in the unfair labor practices alleged in the complaint and recommended that the complaint be dismissed. More specifically he found that this strike being economic in nature and not prompted by any prior unfair labor practices on respondent's part, respondent had a right to replace the strikers with permanent employees, if it did so before the strikers capitulated. Further, that respondent was not obliged to advise the strikers that it proposed to replace them and consequently had the right to warn them in a telegram that the jobs would be filled if they did not return to work within 24 hours. The examiner reasoned that the strikers are presumed to know the law and that the telegram in effect merely restated it for their benefit. In this connection the examiner adverted to the letter of April 24, with the comment that this letter proceeds on the theory that the strikers are no longer employees and concluded that the sending of the telegram and letter did not violate the Act.

The Board disagreed with the trial examiner, holding that respondent's telegram of April 6, did not accurately "restate" the law and did not constitute a mere statement of respondent's right to replace economic strikers but actually operated as a notice of discharge to the striking employees to be effective 24 hours after its receipt if they had not by then reported back to their regular jobs. This conclusion is amply supported by the letter of April 24, which respondent addressed to the strikers and by the testimony of respondent's Vice-President and Manager, R. P. MacKenzie, which is set forth in the margin.[1]

[1, 2] We think the Board was correct in its application of the law to the facts of the case. By striking in support of economic demands the employees clearly engaged in a concerted activity for "mutual aid or protection" within the intendment of § 7 of the Act, 29 U.S.C.A. § 157. They did not by striking in these circumstances cease to be employees and their discharge for engaging in the strike was accordingly a violation of § 8(a) (1) of the Act. N. L. R. B. v. Mackay Radio & Telegram Company, 304 U.S. 333, 347, 58 S.Ct. 904, 82 L.Ed. 1381. It is clear from the authorities that in a situation like the present the employer is free to hire replacements for the strikers at any time prior to their unconditional request for reinstatement, but on the other hand the cases uniformly hold that it is an unfair labor practice to discharge economic strikers prior, as here, to the time their jobs are filled. Carter Carburetor Corp. v. N. L. R. B., 8 Cir., 140 F.2d 714; N. L. R. B. v. Kalamazoo Stationery Company, 6 Cir., 160 F.2d 465; J. A. Bentley Lbr. Co. v. N. L. R. B., 5 Cir., 180 F.2d 641; N. L. R. B. v. Kennametal, Inc., 3 Cir., 182 F.2d 817, 19 A.L.R.2d 562; Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 190 F.2d 576; Cusano v. N. L. R. B., 3 Cir., 190 F.2d 898; N. L. R. B. v. Globe Wireless, Ltd., 9 Cir., 193 F.2d 748.

The trial examiner further found that the evidence considered as a whole does

1. "Q. Then, are we to understand that at the termination of 24 hours after the receipt of the telegram by the seven employees, and if they did not report to work, their employment would be terminated as of that time? A. I considered that they would be terminating it; yes.

"Q. So we say that their employment, then, was terminated approximately 24 hours after 6:30 P. M., April 6, 1950? A. Correct.

"Q. Now, Mr. MacKenzie, when the employees were discharged or their employment terminated by that telegram of April 6th, and their subsequent conduct, their employment was so terminated because of their refusal to work and abandon the strike they were on; is that not correct? A. I consider they terminated their own employment by not returning and running the plant for us."

not support the allegations of the complaint that the respondent failed to bargain collectively in good faith with the union as required by the Act. This finding was based on the ground that the impasse which he found to have existed when the strike broke out, continued during the strike and relieved respondent of the duty of resuming negotiations. As supportive of his contention that the union's proposed contract of May 20, was merely a restatement of the parties' positions, agreed upon, or in dispute, at the close of the last meeting between them, the examiner summarized the facts as follows: "As has been found herein the Respondent, on March 27, at the Union's request drew and submitted a proposed contract to the Union. This was the third such proposal the Respondent drew and submitted at the Union's request. The contract submitted by the Union on May 20, and the Respondent's contract of March 27, are identical in form and language except that the Union's contract omits a clause giving the respondent the right to discharge or discipline for intoxication, violation of safety rules, and some other causes without further recourse to the grievance procedure by the affected employees; omits a clause in the Respondent's draft giving it the right to classify employees; does not follow the Respondent's proposed wage rate, work week or seniority provisions."

The Board agreed with the trial examiner that respondent had bargained in good faith during the period preceding the strike; the Board however did not agree that respondent in failing to meet personally with the union after the strike began had fulfilled its bargaining obligation under § 8(a) (5) of the Act.

■■■■ The Courts have repeatedly held that the duty to bargain arises upon request. N. L. R. B. v. Columbian E. & Stamping Co., 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660; American Federation etc. v. N. L. R. B., 5 Cir., 197 F.2d 451; Joy Silk Mills v. N. L. R. B., 87 U.S.App. D.C. 360, 185 F.2d 732. But here and notwithstanding the fact that the union specifically made four such requests in writing, the respondent refused to meet and

confer with the union during the strike for the purpose of collective bargaining. Section 8(d) of the Act defines "collective bargaining" as the "obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith". This statutory obligation is not satisfied by merely inviting the union to submit any proposition they have to make in writing where either party seeks a personal conference. N. L. R. B. v. Jacobs Manufacturing Co., 2 Cir., 196 F.2d 680. Enforcement of the obligation to bargain collectively is crucial to the statutory scheme and it will not do for respondent to say that it was relieved of the duty to bargain collectively because prestrike bargaining had resulted in an impasse and future negotiations during the strike would have been futile. N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874. The Board recognized that the duty to meet does not mean that parties must engage in futile bargaining in the face of a genuine impasse. Its decision was based on the assumption that the impasse which existed before the strike was broken by the strike and by the change in circumstances that developed subsequent thereto. The examiner failed to consider or discuss this aspect of the situation but based his findings on a partial view of the whole evidence in the case and erred as a matter of law. An examination of the intermediate report shows that he did not consider the fact that a strike of nearly three months' duration may well have created conditions in which the parties would be more willing to make concessions to compromise the matters in difference, nor was the examiner impressed by the fact that the union did make substantial concessions on the issue of wages. Finally he erred as a matter of law in overlooking the fact that § 8(d) imposed the duty to meet at reasonable times and confer and that this obligation is not satisfied by the written communications upon which he relied. We are accordingly of the opinion that the Board properly determined that respondent violated § 8(a) (5) of the Act by refusing to meet with the union during the strike for the purpose of col-

lective bargaining. The Board's holding that the refusal to negotiate further was unreasonable under the changed circumstances then existing and on that account an unfair labor practice has substantial support in the record as a whole. Jeffrey-DeWitt Insulator Co. v. N. L. R. B., 4 Cir., 91 F.2d 134, 112 A.L.R. 948, certiorari denied 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565; see Bus Employees (Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emp. of America, Division 998) v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364; N. L. R. B. v. Reed & Prince Mfg. Co., supra.

Having found that the respondent violated § 8(a) (1) of the Act by discharging its employees because of their strike activity and that respondent had also violated § 8(a) (5) of the Act by refusing to meet with the union during the strike the Board properly ordered respondent to cease and desist from the unfair labor practices found. Affirmatively, the Board directed the respondent to offer the strikers immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights and privileges and make them whole for any loss of pay they may have suffered by reason of respondent's discrimination against them, in the manner set forth in the section of this Decision and Order entitled "The Remedy." The Board also directed respondent to bargain with the union upon request and to post appropriate notices.

The order will be enforced as prayed in the Board's petition.

HUTCHESON, Chief Judge (dissenting).

Because I am of the opinion that the examiner correctly found the facts and as correctly drew the legal conclusions from them, I shall content myself with stating so, and briefly pointing out the nature and source of the errors of the board and the majority of this court in departing therefrom, as I see them.

These errors are: (1) in holding that respondent committed an unfair labor practice in notifying its striking employees that it would like for them to return to their regular jobs and that if they did not return within the time named, the company would consider that they were terminating their employment and a replacement would be hired; (2) In failing to give the proper effect to respondent's letter of May 8th, in which, disclaiming any intention to discriminate against the strikers, the company assured the union that while it had secured replacements for some of the men, it could at the present time employ three, and, as far as the other former employees were concerned, they could make application for reemployment and would be reemployed when vacancies occurred; and (3) in holding that the suggestion of the company, after sixteen sessions of oral negotiations had resulted in an impasse, that written proposals be exchanged, was a refusal to bargain.

It seems as clear to me as it did to the examiner as to the first error, that this being an economic and not an unfair labor practice strike,[1] the action of the respondent in sending the telegram of April 6th, could not be characterized as an unfair labor practice. In Kansas Milling Co. v. NLRB, note 1, supra, in a situation almost identical with that presented here, the court took a position exactly the contrary of that taken by board and majority here, and in NLRB v. Bradley, note 1, supra, the court took substantially the same position. These authorities aside, however, it seems to me, on the plainest principles of common sense and justice: that an employer, situated as respondent was, with a plant fully working, with sixty-five employees on the job and wholly unconnected with the strike, had the right, in the interest of keeping its plant going, to call these employees back; and that, though under no legal duty, since the strike was an economic one, to do so, it was under a moral duty to give these employees a chance to return before it replaced them.

1. Cf. Kansas Milling Co. v. N. L. R. B., 10 Cir., 185 F.2d 413; N. L. R. B. v. Bradley, etc., 7 Cir., 192 F.2d 144, at pages 153-154.

As to the second error, the failure to give effect to the company's statement of attitude and to the failure of the employees to apply for reinstatement, I think it plain: that, under the settled principles of law, the employees ordered reinstated with back pay were not entitled to such reinstatement; and that the enforced order in effect mulcts the respondent because of the failure of its employees to apply for reinstatement and not because of the refusal of the company to reinstate them.

As to the third error, while I am in no doubt that the normal procedure requires meeting and face to face bargaining, I am equally in no doubt that when, after sixteen such meetings, it clearly appeared that no progress was being made, the suggestion by the respondent that the parties try the exchange of written proposals was not a refusal to bargain. Cf. National Labor Relations Board v. American National Ins. Co., 342 U.S. 809, 72 S.Ct. 40, 96 L.Ed. 612, where the court, after pointing out the confusion which has arisen from the notion in some quarters that the bargaining had to result in an agreement and quoting the statute on the point, declared, "Thus it is now apparent from the statute itself that the act does not encourage a party to engage in fruitless marathon discussions at the expense of a frank statement and support of his position." The negotiations had split on wages and seniority. Respondent had made it clear that it could not and would not pay the wages the union demanded. It seems clear to me, as it did to the examiner, that, after sixteen fruitless oral discussions, the company was not only not breaking the law but was indeed acting wisely when it suggested that negotiations at least for a while take the form of written proposals.

Summing up, in this controversy with a small unit of its large plant, seven men went out on strike. Of these seven, each was offered an opportunity to return before the respondent began making replacements. Some of them returned very soon after they went out, some a little later, others did not return or offer to return at all. Yet the respondent finds itself in the position of being branded as a law breaker because it offered these persons a right and opportunity to return, and, adjudged liable to back pay, to persons who did not embrace the opportunity offered them to return.

In my opinion, the respondent in its brief correctly states, "The respondent having reinstated two strikers and having offered reinstatement to the others as vacancies occurred, and having replaced the strikers who did not return to work and the others not having requested reinstatement during or after the strike, it was error for the board to order their reinstatement with back pay. * * * In the first place the board had no right to order reinstatement because there has never been before, during, or after the strike, an application for reinstatement, particularly by the four strikers who left the picket line on June 23, 1950. In the absence of a request by the strikers for reinstatement, there was no discriminatory discharge and there was no unfair labor practice. * * * The board has uniformly held that an employer is not required to give back pay to strikers in the absence of an unconditional offer to return to work unless it affirmatively appears that an application for reinstatement by the strikers would be futile."

That such a situation did not exist here is found by the examiner and conceded by the board and the majority of the court.

It is undisputed that the respondent declared its willingness to reinstate the strikers upon application if and when there were vacancies, and there is no proof that any of them made application for and were refused employment.[2]

I respectfully dissent from the affirmance of the board's order.

2. N. L. R. B. v. Crosby Chemicals, 5 Cir., 188 F.2d 91.