**HAWAII MEAT COMPANY, Limited,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

No. 18323.

United States Court of Appeals
Ninth Circuit.

July 22, 1963.

Rehearing Denied Sept. 5, 1963.

Ernest C. Moore, Jr., Laurence H. Silberman, Honolulu, Hawaii, for petitioner.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles and Ira M. Lechner, Attys., N. L. R. B., Washington, D. C., for respondent.

Charles P. Scully, Victor Van Bourg, San Francisco, Cal., for Meatcutters Union, Local 594, AFL–CIO.

Before HAMLEY, HAMLIN and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Hawaii Meat Company, Limited, asks us to set aside an order of the National Labor Relations Board. The Board counters with a petition for enforcement of its order. We conclude that the order should be set aside. The question presented to us is a narrow one and arises in the following context:

The company is engaged in the wholesale processing of meat at Honolulu. On February 17, 1960, Meatcutters Union Local 594 (AFL–CIO) was certified as representative of the company's employees in a company-wide unit, with certain exclusions not material here. The unit comprised approximately 73 employees in production and maintenance classifications, including 7 drivers, 8 driver helpers and 1 auto mechanic helper. Following certification, there were 10 or 11 meetings at which collective bargaining was carried on between May 2 and June 30, but without agreement. It became apparent to the company during these negotiations that a strike was probable, and, because its management desired to continue operations during the strike, consideration was given to subcontracting the company's delivery services if a strike should occur. The drivers, driver helpers, and auto mechanic helper

were engaged in this phase of the company's business. The company negotiated with two potential independent contractors and a written contract was discussed with one Fukumoto under which he was to agree to perform the necessary delivery services, supplying the necessary personnel and renting trucks from the company. The contract was to begin if there were a strike, and on the strike date, which was expected to be July 1. As finally signed, it was to continue until terminated by either party giving thirty days notice to the other. The proposed contract was prepared on June 28. A strike did occur on July 1 and later that day the contract with Fukumoto was modified and executed. Had there been no strike, the contract would not have been made.

July 1 was a Friday and the first business day thereafter was Tuesday, July 5. On July 1 the company sent to all of its employees a statement that it intended to begin replacing strikers and that unless they returned to work immediately, they would be permanently replaced. This letter also stated that the company could not promise that each employee would get his old job back, or any job, and then stated: "For example, as of Tuesday, July 5, all of our delivery will be done by a trucking company we have made a contract with. There are no longer any delivery truck driver or driver helper jobs."

On July 4, at a union meeting, the business agent suggested that the employees return to work on July 5, but one of the truck drivers, whose job was affected by the subcontracting of delivery work to Fukumoto, objected. A vote was taken, and the strike continued. On July 8, in a letter to the union, copies of which were sent, on July 9, to the employees, the company reiterated the statement that it had subcontracted its deliveries, and no longer had any jobs in the classifications of auto mechanic helper, truck driver, or truck helper. It seems clear that while the decision to subcontract was made as a means of keeping the company's operations going during the strike, either then or thereafter the company also decided to make the subcontract arrangement permanent.

The trial examiner found and concluded that the company had violated section 8(a) (5) of the Labor Management Relations Act, as amended, (29 U.S.C. § 158(a) (5)) by refusing to bargain collectively with the union by reason of its having put the subcontracting arrangement into effect without first giving the union an opportunity to bargain on this question. He also found and concluded that there was a discriminatory discharge of the delivery employees, in violation of section 8(a) (3) (29 U.S.C. § 158(a) (3)).

The Board sustained most of the trial examiner's findings and squarely held that the company was obliged to bargain with the union about its decision to subcontract out its delivery work, even though the employer's decision may have been motivated by economic considerations, rather than by any opposition to the principles of collective bargaining. It therefore found it unnecessary to decide whether the subcontracting was motivated by retaliatory considerations, thus constituting a violation of section 8(a) (3). The Board also said: "We are not holding that before the strike ensues, an employer must reveal his intention to replace strikers on an individual basis, nor do we imply that an employer must advise the union in advance of the strike of his plans to counteract the impact of the strike. All that we are holding in this case is that an employer fails to bargain and violates section 8(a) (5) if, after a strike begins, he does not give the union an opportunity to bargain about his proposal to change the existing terms and conditions of employment among which, and not the least important, is the permanency of the job classifications which were held by employees when the strike began."

On the basis of this holding, the Board also held that the company's letter to employees, a portion of which we have quoted above, converted the strike from an economic strike to an unfair labor

practice strike. It refused to hold, however, that the letter constituted a letter of discharge. The Board further concluded that a letter sent by the union to the company on March 14, 1961, quoted in the margin,[1] was an unconditional request for reinstatement, including an undertaking to abandon the strike if the request were granted.

On the basis of the foregoing, the Board concluded that the company should be ordered to discontinue its subcontracting arrangement, and to offer to the unfair labor practice strikers on whose behalf the union made its unconditional request for reinstatement full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority or other rights and privileges, and that it make them whole for any loss of earnings suffered between the date of the unconditional application for reinstatement and the date of its offer to reinstate, less net earnings during that period.

For the purpose of this decision, we assume, but do not decide, that the Board is correct in the position that it takes that an employer who proposes to subcontract work being done by members of the bargaining unit, thereby eliminating their jobs, must, in the absence of a strike, offer the union an opportunity to bargain about the proposed decision, and that if it does not do so, it violates section 8(a)(5).[2] We also assume that if the employer decides to subcontract as a means of keeping its plant operating during an economic strike, and if thereafter a request is made to bargain upon such decision, the employer's duty to bargain, which is not terminated by the existence of a strike, embraces a duty to bargain about the question of whether, when the strike is over, he will continue the subcontract arrangement.[3] The Board did not base its decision upon this ground.

Our answer is "no" to the narrow question which is presented to us, namely, whether a decision to subcontract, taken at the time an economic strike occurs, and made for the purpose of keeping the plant operating, constitutes a failure to bargain as required by the Act, when, after the strike begins, the employer does not, on its own motion, offer the union an opportunity to bargain about the decision to subcontract. It is the decision to subcontract, not the matter of what is to be done with or for the employees who are displaced by subcontracting, that is here involved. As to the latter there is authority that it is a mandatory subject of bargaining;[4] we express no opinion upon the question.

---

1. "Dear Sir:

   "In several of our negotiating sessions, we indicated to you that your last offer would be acceptable, providing you put the strikers back to work. At those times, you refused to take the strikers back.

   "We are again offering to have all of these strikers return to work with or without a contract."

2. The Board, and the D.C. Circuit, have recently so held in two cases, Fibreboard Paper Prod. Corp., 1962 CCH NLRB ¶ 11,592, enforced, D.C.Cir., 322 F.2d 411 (July 3, 1963), and Town & Country Mfg. Co., 1962, 136 N.L.R.B. 1022, enforced on other grounds, 5 Cir., 316 F.2d 846 (April 29, 1963). Compare these cases, and Timken Roller Bearing Co., 1946, 70 N.L.R.B. 500, enforcement denied on other grounds, 6 Cir., 1947, 161 F.2d 949, with NLRB v. Servette, Inc., 9 Cir., 1962, 313 F.2d 67; NLRB v. Brown-Dunkin Co., 10 Cir., 1961, 287 F.2d 17; Jays Foods, Inc. v. NLRB, 7 Cir., 1961, 292 F.2d 317; NLRB v. Rapid Bindery, Inc., 2 Cir., 1961, 293 F.2d 170; NLRB v. Lassing, 6 Cir., 1960, 284 F.2d 781; NLRB v. Drennon Food Prod. Co., 5 Cir., 1959, 272 F.2d 23; NLRB v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848; Fibreboard Paper Prod. Corp., 1961, 130 N.L.R.B. 1558; Krantz Wire & Mfg. Co., 1952, 97 N.L.R.B. 971, enforced, NLRB v. Armato, 7 Cir., 1952, 199 F.2d 800; Walter Holm & Co., 1949, 87 N.L.R.B. 1169; Mahoning Mining Co., 1945, 61 N.L.R.B. 792; Brown-McLaren Mfg. Co., 1941, 34 N.L.R.B. 984.

3. The existence of a strike does not terminate the duty of both parties to bargain, at least upon request. See, e. g., NLRB v. United States Cold Storage Corp., 5 Cir., 1953, 203 F.2d 924.

4. See NLRB v. Rapid Bindery, Inc., supra, at 172.

■ We think that when an employer is confronted with a strike, his legal position is, in some respects, different from that which exists when no strike is expected or occurs. No case holds that a struck employer may not try to keep his business operating; on the contrary, it is quite clear that he has the right to do so. He may not use the strike as an excuse for committing unfair labor practices. (See, e. g., NLRB v. United States Cold Storage Corp., 5 Cir., 1953, 203 F.2d 924) But it does not follow that what this employer did to meet the strike was an unfair labor practice, even though it might have been one in the absence of a strike.

■ We think that a requirement that, upon the occurrence of a strike, and before putting into effect a subcontracting arrangement designed to keep the struck business operating, the employer must offer to bargain about the decision to subcontract, would effectively deprive the employer of this method of meeting the strike. A mere naked offer to bargain would not end the matter. The union could, by accepting the offer, deprive the employer of an effective means of meeting the strike for a period of time that might render it valueless to the struck employer. An employer is under no duty to offer to bargain, after a strike starts, about a decision to hire replacements for strikers, even on a permanent basis. (See NLRB v. Mackay Radio & Tel. Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381) In that case, the Supreme Court said:

"Nor was it an unfair labor practice to replace the striking employees with others in an effort to carry on the business. Although § 13 provides, 'Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike,' it does not follow that an employer, guilty of no act denounced by the statute, has lost the right to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them. The assurance by respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant places to be filled." (Id. at 345–346, 58 S.Ct. at 910–911)

We think it no more proper for the Board to intrude upon the decision of the employer, in a strike situation, to keep going by subcontracting, than to intrude upon a decision to replace, permanently, individual strikers. This, we think, is consistent with the philosophy expressed by the Supreme Court in NLRB v. Insurance Agents' Union, 1960, 361 U.S. 477, 488–498, 80 S.Ct. 419, 427, 4 L.Ed.2d 454. There the court said:

"It must be realized that collective bargaining, under a system where the Government does not attempt to control the results of negotiations, cannot be equated with an academic collective search for truth—or even with what might be thought to be the ideal of one. The parties—even granting the modification of views that may come from a realization of economic interdependence—still proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest. The system has not reached the ideal of the philosophic notion that perfect understanding among people would lead to perfect agreement among them on values. The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized. Abstract logical analysis might find inconsistency between the command of the statute to negotiate toward an agreement in good faith and the legitimacy of the use of economic weapons, frequently having the most

serious effect upon individual workers and productive enterprises, to induce one party to come to the terms desired by the other. But the truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargaining between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side.

\* \* \* \* \* \*

"But as we have developed, the use of economic pressure by the parties to a labor dispute is not a grudging exception to some policy of completely academic discussion enjoined by the Act; it is part and parcel of the process of collective bargaining.

\* \* \* \* \* \*

"The Board's assertion of power under § 8(b) (3) allows it to sit in judgment upon every economic weapon the parties to a labor contract negotiation employ, judging it on the very general standard of that section, not drafted with reference to specific forms of economic pressure. We have expressed our belief that this amounts to the Board's entrance into the substantive aspects of the bargaining process to an extent Congress has not countenanced."

(Section 8(b) (3) (29 U.S.C. § 158(b) (3)) imposes upon a union the same duty to bargain as is imposed upon an employer by section 8(a) (5)).

None of the cases upon which the Board relies goes so far as we are asked to go here. Most are cited in footnote 2, supra. The case most heavily relied upon, Order of Railway Telegraphers v. Chicago & N. W. Ry., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774, arose under a different statute, did not involve a decision made for the purpose of meeting a strike, and turned primarily upon the construction of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115. Other Supreme Court decisions cited are even less in point.[5]

Neither the Board's answer to the company's petition, nor its petition for enforcement, nor its brief in this proceeding suggests that we should remand in the event that we should conclude that the order must be set aside. However, such a suggestion was made at oral argument, the ground being that the Trial Examiner concluded that the decision to subcontract was "obviously a retaliatory measure for engaging in a protected concerted activity," and violated § 8(a) (3).[6] This issue the Board considered it unnecessary to decide.

The suggestion for remand comes rather late, and the Board points to no evidence that the subcontracting was intended as retaliatory or discriminatory. The Trial Examiner's conclusion rests primarily upon his further conclusion that there was a mandatory duty to bargain about the decision before it was put into effect. Thus, he describes the decision as "clandestine," and as taken "secretly" and "covertly." Under the circumstances, we see no need for a remand. The Board's conclusion that the strike, which began as an economic strike, was changed to an unfair labor practice strike, is bottomed upon its further conclusion that the decision to subcontract violated § 8(a) (5). The first conclusion must fall with the second.

The Board's order is set aside; the petition to enforce the order is denied.

5. NLRB v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230; Local 24, Int'l. Bhd. of Teamsters v. Oliver, 1959, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed. 2d 312; NLRB v. Wooster Division of Borg-Warner Corp., 1958, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823; NLRB v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320.

6. It is true that subcontracting a portion of an employer's activities may be so motivated as to be a violation of section 8(a) (3) (29 U.S.C. § 158(a) (3)). NLRB v. Brown-Dunkin Co., supra; see NLRB v. Rapid Bindery, Inc., supra.