SWEARINGEN AVIATION CORPORATION, Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.

No. 77–1095.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1978.

---

Frank S. Manitzas, San Antonio, Tex., for petitioner, cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Allison W. Brown, Jr., Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Sandra S. Elligers, Atty., N. L. R. B., Washington, D. C., for respondent, cross-petitioner.

Before BROWN, Chief Judge, GEWIN and TJOFLAT, Circuit Judges.

GEWIN, Circuit Judge:

Swearingen Aviation Corporation (the Company) petitions to set aside a decision

and order of the National Labor Relations Board (the Board), and the Board cross-petitions for enforcement. Swearingen was found by the Administrative Law Judge (ALJ) to have violated Section 8(a)(1) of the National Labor Relations Act (the Act)[1] by threatening employees with discharge if they attempted to strike and by discharging certain employees who participated in a walkout at the Company's San Antonio plant. These findings were adopted by the Board, which additionally found that the Company, subsequent to the walkout, refused to reinstate the strikers upon their unconditional offer to return to work, another Section 8(a)(1) violation.[2]

We accept the resolutions of the ALJ relating to credibility and issues of fact, as did the Board, and find that the Company violated Section 8(a)(1) by threatening employees with discharge and by discharging certain employees. To that extent, we are in agreement with the Board. However, we interpret differently the significance and implications of the striking employees' offer to return to work. We agree with the ALJ that the offer was conditional. Accordingly, we decline to enforce that part of the Board's order finding an unconditional offer to return to work, further finding a Section 8(a)(1) violation in the company's refusal to reinstate the strikers, and awarding back pay for the period from September 3, 1975, to the date of reinstatement. That part of the Board's decision finding an unconditional request for reinstatement by Perez, Villarreal and Sierra on August 25, 1975, and the remedy relating thereto, we leave undisturbed.

### Facts

Swearingen manufactures commercial aircraft in San Antonio, Texas. Union elections were conducted among the production and maintenance employees of the plant in 1973, 1974, and 1975. In none of the elections did a majority vote for union representation.

1. 29 U.S.C. § 158(a)(1) (1970).

2. 227 NLRB No. 32. Member Walther dissented from the Board's additional finding that the

On August 15, 1975,[3] Rojelio Ordaz and four other employees were chosen by their coworkers to make known certain grievances to the Company management. Ordaz learned that the Company's latest appeals procedure did not provide for employee grievance representatives and made arrangements, under the revised appeals procedure, to meet with Don Richards, the department head. On August 25 Ordaz met with Richards and presented the workers' grievances. Later that morning Ordaz and Richards met with Thomas J. Haines, the Company's director of employee relations. Although Haines refused to recognize Ordaz as the spokesman for anyone other than himself, the credited testimony of Ordaz established that he continued to speak for the employees and Haines listened to him. Ordaz pointed out the need for a wage increase and safer working conditions. The meeting ended at approximately 10:45 a.m.

During the lunch break, fellow workers met with Ordaz to find out what had happened at the meeting. Ordaz informed them that the wage problem had not been resolved and that he "had gotten the runaround." After further discussion, the employees decided to walk out. At the end of the lunch break and shortly thereafter, a total of 24 employees locked their tool boxes, walked out, and assembled in a nearby roadside park.

Haines received instructions from his superior to replace the strikers, but not to discharge them. Haines was also told to let word "leak out" into the shop that the employees who had walked off the job had been discharged, in order to discourage further walkouts. Testimony of non-striking employees shows that several foremen effectively carried out this directive. Three employees who joined the strike returned to the plant that afternoon and had separate interviews with Haines. According to their credited testimony each was informed that he had been discharged.

Company refused to reinstate the striking employees.

3. All dates are 1975 unless otherwise noted.

Ordaz telephoned Haines twice on August 26th. During the first conversation, Haines informed him that the people who walked out had been terminated. Ordaz telephoned Haines a few minutes later, with the intention of making an offer for the employees to return to work. Ordaz told Haines he was speaking on behalf of the people who walked out. Haines responded that he had nothing to indicate Ordaz was their spokesman and that he would not recognize him as such, and hung up the telephone.

Around mid-afternoon on August 26 a group of the strikers met at the roadside park. Ordaz, as spokesman, was interviewed by a local television reporter. Ordaz stated they were protesting wages and grievance procedures. Ordaz told the reporter he had called Haines earlier to offer the unconditional return of the strikers to work, but Haines had hung up on him. The reporter related Ordaz' statement to Haines in a subsequent telephone interview. Haines responded that no such offer had been made. The story was broadcast twice that evening, and Ordaz was identified as the spokesman for the striking employees.

On September 2 Ordaz and Haines agreed to meet to discuss reinstatement of the strikers. Haines instructed Ordaz to bring something to indicate he was spokesman for the group. At the meeting, Ordaz showed Haines a petition signed by all but one of the striking workers. Haines indicated that he would reinstate everyone except Buentello and Salazar—two men whose positions as group leaders qualified them as supervisory personnel in the plant, and who had also been terminated by the Company.[4] Ordaz returned to the park where most of the strikers were gathered, to discuss Haines' offer with them. The striking employees, as well as Buentello and Salazar, agreed that those two would not be included in the offer to return to work.

Ordaz and Haines met for the last time on September 3. Ordaz presented Haines a document to the following effect:

To Reinstate the Strikers unconditionally, immediately as I proposed 8/27/75. Rojelio S. Ordaz.

Haines refused to accept the document. Ordaz told him the August 27 date should be August 26, the day on which Ordaz claimed he tried to make an unconditional offer on the telephone and Haines hung up on him, and when the television reporter had promised to tell Haines about the unconditional offer. Haines responded that he had hung up the telephone because he thought the conversation was over; he could not go by what the reporter said because the reporter had been incorrect as to other facts; and the only offer he had received had been made on September 2, the previous day, and was conditioned on reinstatement of the two group leaders. Haines offered to accept the document if Ordaz would change the date to September 3. After some deliberation Ordaz decided to make the document, as written, his final offer. Haines refused to accept it, for fear he might acknowledge that an unconditional offer had been made on August 26 or 27, thereby possibly subjecting the Company to liability for back pay from that date. Ordaz left and no more communication between him and Haines occurred.

It appears from the record that all the strikers except Buentello and Salazar were reinstated within one week of a September 18 communication from the Company.

## Discharges

■ The Board's finding that the Company violated Section 8(a)(1) by threatening the employees with discharge if they attempted to strike is not challenged by the Company. That finding is supported by substantial evidence and the Board's order in that respect is enforced.

■ The Board further found that the Company discharged the striking employees in violation of Section 8(a)(1). The record evidence amply supports that finding. Joe Perez, Pete Villareal, and Joe Sierra re-

4. The Board concluded that Group Leaders Buentello and Salazar were supervisors within the meaning of the Act and that their termination did not violate the Act.

turned to the plant shortly after the walk-out. They spoke individually with Haines. Perez, a sheet metal assembler, offered unconditionally to return to work, admitting that perhaps his participation in the walkout was wrong. Nevertheless, Haines told him, there was no way he could help him, since the Company could not tolerate walkouts. Villareal next met with Haines and discussed a possible raise in salary. Haines told him he was terminated for walking off the job without permission. Joe Sierra, a sheet metal mechanic, asked Haines for his job back. Haines told Sierra he couldn't help him. Asked by Sierra if that meant he was fired, Haines responded affirmatively.

On August 26, striker Jesus Nieto returned to the plant. A foreman told him everyone who walked out was fired, and directed him to sign a paper stating he was dismissed for walking off the job. Later that day Haines told Ordaz, according to Ordaz' credited testimony, that "the people that walked out yesterday . . . have been terminated for walking off the job without their supervisors' permission." Ordaz related his conversation with Haines to Branson, the television reporter. Branson understood the employees to be discharged and reported the incident on his news broadcast. Although Haines' testimony regarding his conversations with Ordaz, Perez, Villareal, and Sierra contradicted their stories, the ALJ found Haines not to be a "particularly" credible witness and accepted the testimony of the employees.

■ The Company describes Haines' efforts to discourage the strikers as a tactical maneuver, designed to prevent the spread of the strike. The Company cites several decisions characterizing the threat of discharge as a tactical move on the part of the employer, by means of which he hopes to induce his employees to return to work.[5] However viable a concept the "tactical discharge" may be, the argument clearly has no force once the employer accomplishes the employee's severance. The record reveals instances of Company officials and supervisory personnel informing both striking and non-striking employees that participants in the walkout had been discharged. The Company's denial that the employees were discharged flies in the face of the ALJ's credibility determinations. We agree with the Board that the Company discharged striking employees in violation of Section 8(a)(1).

### Refusal to Reinstate

■ The Board determined that the Company's unlawful discharge of the strikers converted the economic strike into an unfair labor practice strike. The record fully supports the Board's conclusion that the strikers were not permanently replaced.[6] The discharge of unreplaced eco-

5. Discharges which are treated by the Board as discharges in name only are not effective to destroy the employee status of striking employees. *Biles-Coleman Lumber Co.*, 4 NLRB 679 (1937), and *Matlock Truck Body & Trailer Corp.*, 217 NLRB 346, 1974–75 CCH NLRB ¶ 15,637, involved threats of future discharges. In *Aldora Mills*, 70 NLRB 1 (1948), and *Roanoke Public Warehouse*, 72 NLRB 1281 (1947), equivocal conduct by management, e. g., telling employees to return to work immediately after issuing discharge slips, blunted the effect of the purported termination. In the latter cases, in any event, the employers' activities were held to violate Section 8(a)(1), since the threats interfered with the employees' exercise of Section 7 rights. *In Re Public Ledger, Inc.*, 63 F.Supp. 1008, 1015 (E.D.Pa.1945), was a bankruptcy proceeding holding that the employees' termination resulted from a court order rather than the acts of the trustees. *Shopmen's Local Union No. 733 v. NLRB*, 219 F.2d 874 (6th Cir.

1955), is more supportive of the Company's position. In that case a letter from the employer threatened employees with termination if they failed to return by a certain date. The objective action of the employer in reemploying strikers who unconditionally offered to return, even after the employer had removed their personnel files to the "inactive" cabinet, convinced the court that the employer had not impaired the protected status of the striking employees. However, Section 8(a)(1) violations were found. To the extent *Shopmen's Local* can be read to permit actual discharge of employees under the guise of a tactical maneuver, we disapprove its reasoning.

6. The following findings of the ALJ were adopted by the Board on the replacement issue:

The applicable rule provides that the respondent bears the burden of proving that strikers have been permanently replaced. *Truck*

nomic strikers is an unfair labor practice regardless of whether the strike ever became an unfair labor practice strike, *NLRB v. International Van Lines,* 409 U.S. 48, 52–53, 93 S.Ct. 74, 77, 34 L.Ed.2d 201, 205. We need not decide whether the Board correctly characterized the status of the strike. No legitimate and substantial business justifications for refusing reinstatement were put forth by the Company, save its replacement argument. Given the Board's finding that no permanent replacements had been hired, the workers were entitled to immediate reinstatement upon their unconditional application to return to work. *See NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 379, 88 S.Ct. 543, 19 L.Ed.2d 614, 618 (1967); *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 82 L.Ed. 1381, 1390 (1938); *Wilkinson Manufacturing Co. v. NLRB,* 456 F.2d 298, 305–06 (8th Cir. 1972). An employer may not use a strike as an excuse for committing unfair labor practices. *Hawaii Meat Co. v. NLRB,* 321 F.2d 397, 400 (9th Cir. 1963); *NLRB v. John Zink Co.,* 551 F.2d 799, 802 (10th Cir. 1977).

■ We agree with the Board that Perez, Villareal, and Sierra made unconditional offers to return to work on August 25, during their interviews with Haines.[7] We cannot uphold the Board's determination that the other strikers made an unconditional application for reinstatement.

■ A decision of the Board will stand when based on substantial evidence, viewing the record in its entirety. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488–90, 71 S.Ct. 456, 464–465, 95 L.Ed. 456, 468–69 (1950). This special consideration is accorded Board findings of fact and mixed questions of fact and law because of the Board's experience in the specialized field of labor law. Where, as in this case, the crucial issue is the legal significance of a written statement, neither the statute authorizing review[8] nor respect for the Board's expertise so limit our review. *See Rosen v. NLRB,* 455 F.2d 615, 617 (3d Cir. 1972); *Oneita Knitting Mills, Inc. v. NLRB,* 375 F.2d 385, 392 (4th Cir. 1967). As the Supreme Court stated in a decision recognizing the special expertise of the Board in the area of collective bargaining, "[t]he Board's holding . . . depends on the application of law to facts, and the legal standard to be applied is ultimately for the courts to decide and enforce." *Allied Chemical & Alkali Workers v. P.P.G. Co.,* 404 U.S. 157, 182, 92 S.Ct. 383, 399, 30 L.Ed.2d 341, 359 (1971).

■ Accepting the version of the facts articulated by the ALJ and adopted by the Board, we hold that the employees' offer to return to work communicated by Ordaz to Haines on September 3 was conditional as a matter of law. As noted earlier, Ordaz began the meeting by delivering to Haines a document which read "To Reinstate the Strikers unconditionally, immediately as I proposed 8/27/75. Rojelio S. Ordaz." He explained that the August 27 date should be

---

*Drivers and Helpers Local No. 728, I.B.T. v. NLRB (Georgia Highway Express, Inc.),* 131 U.S.App.D.C. 195, 403 F.2d 921 (C.A.D.C.) [cert. denied 393 U.S. 935, 89 S.Ct. 296, 21 L.Ed.2d 272 (1968)]. Yet the only evidence presented by the Respondent consisted of testimony by Haines who has been found not particularly creditable; his testimony lacked the specificity required such as exactly who replaced whom and when; and no documentary support was offered as was done to support Haines' version of other events, despite Haines' assertion that Englebach ordered him to "document everything," and that he followed that order by maintaining "a separate listing" of which job was filled by which replacement. Moreover, Haines admitted he never told any striker he had been

replaced. Also unsupported was Haines' further testimony that the only reason he eventually, on a date he believed to be September 18, offered "the jobs back to those people who walked off" was that the Company "had an increase in our production schedule."

7. Although Villareal initially requested reinstatement with a wage increase, the Board found that Haines informed Villareal he would not be rehired under any circumstances, *i. e.,* with or without the requested 10 cent raise, thereby creating conditions that would tend to render any subsequent offer by Villareal futile. We do not disturb the Board's finding in this respect.

8. 29 U.S.C. § 160(e).

August 26. This offer, by its own terms, was conditioned upon Haines' acknowledgment that an unconditional offer had been made on August 26. Moreover, Haines expressed his willingness to accept Ordaz' offer if he would change the date to September 3. Ordaz indicated he was not authorized to do that.

Even if, by some stretch of the imagination, Haines could be considered to have constructively received an offer when he refused to talk to Ordaz on August 26, that offer would have been conditional because it included group leaders Buentello and Salazar with the other employees seeking reinstatement. Buentello and Salazar were represented by Ordaz, who sought the return of the employees on an "all or none" basis until September 2. To penalize Haines for refusing to accept a document with legal consequences unknown to layman or lawyer would be manifestly unfair.

Counsel for the Board attempt to show that an otherwise unconditional request for reinstatement does not become conditional merely because it refers to a prior request. In the two cases relied on by the Board, spokesmen for striking employees wrote the employers that they were *again* offering to have all strikers return to work. In each case the prior offer was conditional. In *Hawaii Meat Co., Ltd.*, 130 NLRB 966 (1962), *enf. denied on other grounds*, 321 F.2d 397 (9th Cir. 1963), the Board rejected the company's contention that the words "we are again offering" placed a condition upon the reinstatement request. The Board was clearly correct, as the Union in its final offer had abandoned all economic demands and had even offered to have the strikers return to work without a contract. Likewise, in *J. A. Terteling & Sons, Inc.*, 152 NLRB 1014 (1965), the Board found that the strikers' reference to the prior offer did not limit the otherwise unconditional reinstatement request. In both cases the later offers made clear the strikers' desire to return on the terms and conditions of employment existing when the strikes began.

The instant case is different. Ordaz' insistence on Haines' acceptance of the paper, his refusal to change the date to September 3, and his apparent lack of authority to change the date, all indicate the importance Ordaz, and possibly the other strikers, placed on including in their offer of September 3 the uncommunicated offer of August 26. This is not a case where "the claim that the offer to return was conditional is so tenuous as to verge on the frivolous." *NLRB v. J. A. Terteling & Sons, Inc.*, 357 F.2d 661, 662 (9th Cir. 1966). Ordaz never communicated to Haines the strikers' desire to unconditionally apply for reinstatement to the jobs they held at the time they went on strike.

To say that judicial review of Board decisions is limited does not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. *NLRB v. Brown,* 380 U.S. 278, 290–91, 85 S.Ct. 980, 987–988, 13 L.Ed.2d 839, 848–49 (1965). Having concluded that part of the Board's decision rests on an erroneous legal foundation, we enforce only that part of the Board's order finding Section 8(a)(1) violations for threatening employees with discharge, discharging striking employees, and refusing to reinstate Perez, Villareal, and Sierra upon their unconditional offers of August 25 to return to work.

ENFORCEMENT GRANTED IN PART and DENIED IN PART.